[No. 3854.]

SANKEY v. CRAMER.

1. TRIAL—*Pleading and Evidence.* Evidence of matters nowhere alleged in the pleading is not to be admitted.

2. PRINCIPAL AND AGENT—*Duty and Disabilities of Agent.* A broker is employed to find a purchaser of mining property for a price named, and is to receive a special commission. Without informing his principal he attempts to sell the property for a very much larger sum. *Held* a palpable violation of the duty which he owed to the principal. *Held* further that if he had succeeded in his effort the principal might have recovered from him, not only what he had received above the price fixed in his employment, but the promised commission as well.

3. QUANTUM MERUIT—*For Services Rendered.* Whoever sues upon a *quantum meruit* for services rendered must establish the employment, the rendition of the service, and the reasonable value thereof.
  The evidence examined and held insufficient upon all points.

4. APPEAL—*Judgment.* Where, by the plaintiff's own testimony, and by documentary testimony not susceptible of alteration or explanation, it appears that the plaintiff's case is without a merit, a judgment in his favor will be reversed, and the court below directed to enter judgment for defendant.

*Error to Summit District Court.* HON. CHARLES D. CAVENDER, Judge.

Messrs. VAILE, McALLISTER & VAILE, for plaintiff in error.

Mr. JAMES T. HOGAN, for defendant in error.

CUNNINGHAM, Presiding Judge.

The appeal originally taken in this case was by the supreme court re-entered, on stipulation, as pending on error, before transfer to this court. The action was brought to recover a commission which plaintiff claimed on the sale of certain mining property. The complaint was filed August 5, 1904. The first paragraph of the complaint alleges that the amount involved is not over $2,000. The second, that plaintiff was a broker engaged in selling mining property. The third avers that on or about August, 1900, the plaintiff and defendant entered into an oral agreement whereby plaintiff was to act as broker for defendant and use his best endeavors to sell *certain mining property for defendant.* In the fourth paragraph it is alleged that the terms of the agreement required plaintiff to procure a purchaser for the property at a sum *not less than $20,000,* for which plaintiff was to receive as a commission the sum of $2,000. The fifth charged that plaintiff faithfully performed his part of the agreement, *and procured a purchaser,* giving the name thereof. This paragraph further avers that prior to July 1st, 1901, the defendant, ascertaining from the plaintiff who the prospective purchasers were, communicated with plaintiff's prospective purchasers, and thereafter sold the premises to one Edward Kent, trustee for them, for $25,000. So far, the complaint is based entirely upon a specific agreement. The sixth and seventh paragraphs apparently attempt to state a cause of action based on *quantum meruit* and read as follows:

"Sixth. That for the purpose of completing said sale the said defendant requested this plaintiff to go from

his home in Breckenridge, Colorado, to meet the said defendant in Denver on or about the 18th day of July, A. D. 1901, which said plaintiff did, and where and when said plaintiff further assisted defendant in making said sale, whereupon defendant promised and agreed in consideration of plaintiff's labor in behalf of making and consummating said sale, to pay him, the said plaintiff, therefor.

"Seventh. That the said commission agreed upon, to-wit: the sum of two thousand dollars, which plaintiff was to have and receive, is a reasonable compensation for such labor and service performed by plaintiff for defendant."

Whether these two paragraphs, which are the last in the complaint, state a cause of action on *quantum meruit* we need not determine for the reason that in his first instruction to the jury the trial judge advises them that:

"The plaintiff has elected to stand upon this latter cause of action and it is in law what is known as *quantum meruit*."

This instruction was signed by the attorneys for both the plaintiff and defendant, and no exception was taken to it. We have been unable to find when in the record such an election was made, but, in the circumstances just stated, shall assume that such election was made, and consider the case as though plaintiff had stated a good cause of action on *quantum meruit*.

1. The record, which consists largely of correspondence between the parties, discloses that for almost a year the plaintiff, acting under his specific contract, unsuccessfully attempted to affect a sale of the property, and during all this time he represented to the defendant that he was selling it at $20,000 or thereabouts. At times he was very positive that he had found a purchaser, and that the sale would be consummated if more time was given

him, and the defendant, from time to time, at the solicitation of the plaintiff, granted an extension of time in which to complete the sale. Finally, on May 30th, 1901, Sankey wrote Cramer that it was his intention to take the property off of the market if it was not sold by July first, and again on June 22nd, in a letter, he assured the plaintiff that it was his fixed purpose to take the property off of the market by the first of July, if he, Cramer, had not found a buyer by that time.

During all this period of time, from August, 1900, to July, 1901, the plaintiff was attempting to sell the property to the Mecca Gold Mining Company for from $45,000 to $50,000. By his own testimony it appears that Cramer was to receive, if he could induce the Mecca Company to take the property at that price, something like $11,000 over and above his commission of $2,000, provided for in the agreement; the balance of the excess was to go to two other stockholders in the Mecca Company, presumably as a recompense for assistance they were to render Cramer, who was also a stockholder in the Mecca Company, in inducing that company to purchase the property at the price Cramer was holding it. The record also clearly shows that Sankey had no knowledge whatever, prior to the time he cancelled the sale agreement, that Cramer was attempting to get anything out of the property more than his commission, or that he was attempting to sell it at more than $20,000. It is true that Cramer was permitted to testify, over objections made on behalf of the defendant, that he had complained at the time of the agreement, to Sankey, that $2,000 was not a sufficient commission, and that Sankey then told him that he might add a reasonable amount to the price, but this testimony was improper, and its admission constituted reversible error, since there was no allegation in the complaint whatever to warrant its admission. On the contrary, it will be seen from the unequivocal allegations of the complaint

that he was to receive but $2,000. Further, it can scarcely be contended seriously that to add $30,000 to a $20,000 property is a reasonable raise. We have, therefore, this situation, which prevailed down to July 1st, 1901, when Sankey took the property off the market: Cramer was co-operating with two other stockholders of the Mecca Company to sell the property to his own company, for more than twice the minimum price at which it had been listed with him, and for his own unlawful gain. This notwithstanding he himself alleges in his complaint that he was to use his ''best endeavors to sell for said defendant'' the mining property in question, ''at a sum not less than $20,000, *for which said services the plaintiff was to have and receive the sum of $2,000.*'' This was such a palpable violation of every rule of law governing the relation of principal and agent as to make comment inadequate and the citation of authorities entirely unnecessary. Had Cramer succeeded in selling the property for $50,000, Sankey could have, in a proper action, recovered not only the excess, but the commission of $2,000, had the plaintiff retained that sum. A similar situation is discussed at length in *Collins v. McClurg,* 1 Colo. App., 349, 29 Pac., 299. We adopt the views therein expressed as our own, and approve the authorities there cited.

2. Looking upon the testimony of the plaintiff in its most favorable light, and disregarding entirely the very satisfying testimony given on behalf of defendant, which squarely contradicts that offered by the plaintiff, the only services that plaintiff rendered to defendant, after the defendant took the property from his hands, consisted of a trip from Breckenridge to Denver, made by the plaintiff at the suggestion of the defendant, which covered a day's time. On that day the defendant sold the mine for $25,000 to one Kent, trustee, who, it developed afterwards, was purchasing it for the Mecca Company. The plaintiff testified that he urged the defendant not to accept $20,000

for it, as he was about to do, and says that he told the defendant then that he was presenting it to the Mecca Company for $45,000. By much persuasion (so plaintiff testified) he induced the defendant to raise the price of the property from $20,000 to $25,000, and thereby the defendant received $5,000 more for the property than he otherwise would have done. For his services in this behalf he has been allowed a judgment of $2,000. There is no testimony whatever to show what such services are worth, and the only evidence in the entire case on the value of services was that offered by the plaintiff, who said that ten per cent was a very reasonable commission. This testimony was given without any reference to the particular property, the amount at which it was being sold, the labor rendered, the going rate of commissions, or anything of that sort. The plaintiff did not sell the property at all, but for nearly a year, by his own wrong, he prevented a sale satisfactory to the defendant being made. The testimony shows that during the day that plaintiff was in Denver, he did not say a word to the prospective purchaser, or even see him. There is nothing in the letter of Sankey to Cramer inviting him to come to Denver indicating that he desired him to come to assist in making a sale, and there is not a word in the record to show that he ever asked him to assist in closing the deal on the day it was made. But the letter from Sankey to Cramer, wherein the former invited the latter to come to Denver, does clearly show that Sankey desired to give Cramer an opportunity to buy the property at whatever price he, Sankey, might decide to sell it. While on the stand Sankey testified that when he met Cramer in Denver he told him that he had been offered $25,000 for the property, and, pursuant to his previous assurances, he now offered Cramer the refusal of the property at the same price and upon the same terms as to payments; that Cramer declined to accept the property or to take it

at that price. Although he was on the stand thereafter,
Cramer does not dispute this testimony. We think it fair
to assume that Sankey's only purpose in inviting Cramer
to come to Denver was prompted by motives of good faith,
and a desire to keep his word with Cramer and to give
him an opportunity to purchase the property if he was
then in a position to do so. The testimony of Cramer as
to the new promise or agreement of Sankey to pay him
for his services rendered in Denver on the date of the
sale, is as follows:

"Q. Did he (meaning Sankey) tell you what he sold
it (meaning the mining property) to those people for?
A. He said he sold it for $25,000 when he came back
(meaning when he came back from an interview after
having left witness Cramer). I told him I had earned
my commission and was entitled to it and should have it.
*I do not remember his exact words, but I think he said,*
'You shall have it; you have worked hard on this and
have earned your commission.' I do not recall any fur-
ther conversation with Mr. Sankey  *  *  *  and I think
he went home from Denver on the next day."

It is upon testimony of this character that this judg-
ment, if upheld, must rest. We think it is quite insuffi-
cient. Furthermore, it appears that Cramer never made
any demands upon Sankey for, or mention of, his com-
mission until the complaint was filed, more than three
years thereafter, and this notwithstanding much corre-
spondence passed between the two men. During the time
intervening between the date of the sale of the property
and the bringing of this action, the record discloses that
Cramer remitted money to Sankey for rents which the
former had collected for the latter. It further appears
that Cramer's attorney, under his instructions, wrote to
the officers of the Mecca Mining Company, on July 13,
1901, demanding from these officers pay for Cramer's

services in making the sale of defendant's property to them, and his attorney advised them that he had been retained by Cramer to collect by due process of law from these officers the amount of plaintiff's demand.

3.   The trial court committed other prejudicial error in the admission and rejection of testimony, the giving and refusing of instructions, and in remarks made to counsel during the trial in the presence of the jury, which, because of the conclusion at which we have arrived as to the disposition to be made of the case, it will not be necessary to consider.

In view of the conduct of the plaintiff in this case, as established by his own testimony, and by letters introduced on behalf of defendant, which were received without objection, and which could not be altered or explained away on a subsequent trial, the ends of justice require that the judgment in this case should be reversed and the case remanded with directions to the trial court to enter a judgment in favor of defendant, which is accordingly done.

*Reversed and Remanded With Direction.*

Decided March 10, A. D. 1913.   Rehearing denied April 14, A. D. 1913.